

1 | DIETER ZACHER, ESQ. State Bar #165651
dzacher@hotmail.com
2 | THE ZACHER FIRM
17011 Beach Boulevard, Suite 900
3 | Huntington Beach, CA 92647
Telephone: (714) 960-6170
4 | Facsimile : (714) 960-6180
Attorneys for Plaintiff
5 | Julie Stout

6 | **UNITED STATES DISTRICT COURT**

7 | **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

8 | JULIE STOUT,                                    Case No. 8:20−cv−01675−FLA−KES

9 |              Plaintiff,                         **PLAINTIFF'S OPENING BRIEF**

10 |         v.

11 | LIBERTY LIFE ASSURANCE COMPANY
OF BOSTON; and DOES 1 through 10,                 Complaint Filed:    September 3, 2020
12 | inclusive,                                     District Judge:     Hon. Fernando L. Aenlle-
                                                                       Rocha
13 |              Defendant.                        Magistrate:         Hon. Karen E. Scott

14 |

15 |         COMES NOW PLAINTIFF, JULIE ANN STOUT, and hereby provides her Opening Brief

16 | in this matter as follows:

17 | 1.   **STATEMENT OF CASE**

18 |         This action arises out of Liberty's decision to deny Ms. Stout's claim for short-term disability

19 | ("STD") benefits under her former employer DS Americas, Corp.'s ("DS Americas") Group Plan

20 | (the "Plan"). Ms. Stout is owed STD benefits under Group Policy No. GF3-810-260082-01 (the

21 | "Policy"), issued by Liberty and offered by DS Americas. The Plan is governed by the Employee

22 | Retirement Income Security Act of 1974 ("ERISA") and designed to provide disability benefits to

23 | employees of DS Americas. Liberty denied Ms. Stout's claim for STD benefits on May 15, 2019.

24 | Ms. Stout submitted an appeal of the denial of her STD claim on November 8, 2019, which appeal

25 | was wrongfully rejected by Liberty on March 31, 2020. Because of the denial decision, she never

26 | applied for or received long-term disability ("LTD") benefits under the Plan. Based on the futility

27 | of filing an LTD claim, she filed this litigation instead.

2.   **INTRODUCTION**

        Ms. Stout is entitled to STD and LTD benefits from Defendant Liberty, which administers

claims under the Plan.[1]  Ms. Stout has a long-standing and well-documented history of chronic and debilitating pelvic, abdominal and lower-back pain.  She has been disabled beginning on or before February 15, 2019 due to comorbid conditions including degenerative disc disease in her spine, leg instability that limits her ability to walk, ilioinguinal neuralgia, endometriosis, chronic pelvic pain and debilitating intestinal adhesions resulting from 11 ovarian disease operations that cause her to be bed-ridden with sharp stomach pains and flu-like symptoms.  She has also suffered from mold exposure, which caused multiple bouts of pneumonia, a thyroid condition known as Hashimoto's disease, post-traumatic stress disorder ("PTSD") from domestic violence and major depressive disorder.

The evidence will show that despite support from her doctors, who certified her disability and concluded that Ms. Stout could not perform her "**own occupation**" due to her comorbid conditions, pain, fatigue and distress, as well as the side effects of her pain medications, Liberty relied upon biased and financially conflicted paper reviewers, who ignored Ms. Stout's medical records and the opinions of her treating providers, to justify its denial of her much-needed disability benefits.  Liberty particularly relied upon Neil McPhee, M.D., a doctor who has made a career of providing insurer-favorable opinions.  Dr. McPhee twisted the statements of her treating providers, discounted their opinions and findings and completely ignored her subjective complaints of pain and fatigue.  Dr. McPhee's bias and advocacy bled to the surface when he went so far as to personally attack Ms. Stout's attorneys and falsely accuse them of fraud, without basis, in his medical "review" of Ms. Stout's file.  Based on the symptoms of her later-diagnosed multiple sclerosis, Ms. Stout could no longer perform the substantial and material acts necessary to fulfill her usual occupation with DS Americas, which required her to travel extensively, work on a computer for long periods of time, lift heavy suitcases and frequently stand/bend in addition to working long and mentally exhausting hours, over 60 hours per week.  The evidence unequivocally leads to the conclusion that Liberty's denial decision must be reversed, as Ms. Stout is disabled from performing her "**own occupation**" with DS Americas.  In addition, Ms. Stout is clearly now disabled from performing her own occupation as it is performed in the national economy, based on her recent MS diagnosis and her continuing disability as the result of other comorbid conditions.

---

[1] In January 2018, Lincoln Financial Group agreed to acquire Liberty Life Assurance Company of Boston from Liberty Mutual Insurance Group for $3.3 billion and retained Liberty's group benefits business.  Defendant Liberty issued the policy in question here and will be referred interchangeably as "Liberty" or "Liberty/Lincoln" or "Lincoln".

3.  **KEY ISSUES**

- Whether Liberty's decision to deny Ms. Stout's claim for STD benefits should be upheld, and what relief would be appropriate if it is not upheld, including attorneys' fees, costs and pre-judgment interest.

- Whether Liberty's denial of the claim for STD benefits was sufficient to constitute a denial of her claim for LTD benefits and, therefore, whether Ms. Stout has exhausted her available administrative remedies with respect to her LTD claim.

- Whether Ms. Stout's agreement to settle the lawsuit that she filed against her former employer, DS Americas, estops her claims for STD or LTD benefits, notwithstanding express language in the settlement agreement indicating that it did not resolve the pending causes of action asserted against Liberty in this case.

- Whether Liberty's wrongful denial of Ms. Stout's benefits should be reviewed de novo or under an abuse-of-discretion standard.

4.  **STATEMENT OF FACTS**

   A.   **Ms. Stout's Occupational Duties, Job History, Experience and Training**

   The evidence will show that Ms. Stout worked as a global brand customer executive for 11 months at DS Americas, a leader in 3D design and engineering software. Before that, she worked at Infor, an enterprise software company, from 2013 to 2018 and at Flex, a multinational technological manufacturer, from 2006 to 2010 in the same line of business. At the time of her disability onset in February 2019, she had 20+ years of account management experience: selling hardware and software solutions to Fortune 500 accounts; leading global international manufacturing, logistics, operations, supply chain, retail hardlines, softlines, ISV/Channel partner sales and SaaS-based applications; and launching businesses into new markets. Ms. Stout generated more than $600 million in annual revenue growth for Flex in one 18-month period.

   Ms. Stout was always traveling and very hands-on and motivated to excel in all of her job responsibilities, while working in excess of 60 hours per week each year. She flew from Texas to the East Coast regularly as a global brand customer executive. At the time when she went on disability, she was traveling (as detailed below, she got very sick in Boston) and was on the phone and computer most of the time. Ms. Stout's job duties therefore required sitting, walking, lifting heavy objects (like heavy suitcases that were at least 25 pounds) and frequent standing/bending, in addition to spending long hours on plane trips. Her job was mentally demanding and required working under strict deadlines, performing extensive work and speaking to people in person and on

the phone extensively, for hours at a time, all of which was very stressful.  As set forth in detail below, she can no longer do any of that work, and she is constantly in pain and fatigued.

Ms. Stout was a dedicated, hard-working employee who enjoyed her job until she could no longer work due to the onset of her various disabilities.  As set forth below, these disabilities prevent her from performing her own occupation not only at DS Americas but also as it is performed in the national economy.

## A.   <u>Summary of Ms. Stout's Disability</u>

Ms. Stout was diagnosed with Multiple Sclerosis in March 2021, a diagnosis that is consistent with her prior diagnosis for Hashimoto's disease.  Detailed below are the medical conditions that were contained in the administrative record, which record Ms. Stout will seek to augment to include the unfortunate and telling most recent diagnosis.

Ms. Stout has three fractured discs and suffers severe pain from those spinal conditions. Her right knee and leg/ankle are disabled to the point that she falls down constantly.  She has ovarian disease, for which she has had 11 operations.  She has mold-exposure issues (including a thyroid condition known as Hashimoto's disease, which left her bedridden), blood disorders, PTSD from domestic violence and major depressive disorder.  Recently, she learned that she may have cervical cancer, and most recently, she was diagnosed with Multiple Sclerosis.  She has had severe illnesses, including multiple bouts of pneumonia and an ER visit for her knee and the three fractured discs.  After being on disability for two weeks (during which her employer forced her to keep working), she fell down 16 stairs due to dizziness from these conditions. Her Cedars-Sinai Pain Specialist, OB/GYN Surgeon, ENT specialist and family physician have all certified that she is disabled from work.

Constance Bouvier, PA-C, Ph.D., has further certified Ms. Stout's total disability as follows:

> Ms. Stout has been a patient at this office since December 12, 2018 after relocating to Orange County. She originally presented with a history of spousal abuse, in which she was the victim. During this time, she received 3 fractured discs, L3, L4, and L5. She also stated that she had been exposed to mold in her home and that she had been diagnosed in June with respiratory symptoms and vertigo and was hospitalized in Cedars Sinai and was unable to work. This infection also heavily impacted her sinuses and she was under the treatment of an ENT. She continued to cough and was diagnosed with pneumonia in November of 2018. She was still

suffering from a cough at her first appointment at this office. Since then, she has had bloodwork, which revealed Hashimotos [sic] thyroiditis, for which she is in ongoing treatment and has been experiencing general malaise. She also states she is experience [sic] "brain fog" and cannot concentrate. She states that she has been sleeping up to 15 hours per day. She later complained of a hernia, which she states was bulging, and she felt her "insides coming out". Though this was not evident on a CT, an MRI was recommended by the surgeon and, at the last encounter, she awaited approval from insurance. She fell down 16 stairs due to pain and dizziness in March and has had problems with knee effusions since that time. She continues to walk with a brace. Patient states she has had 10 ovarian procedures and a complete hysterectomy subsequent to those procedures.  Back pain has prevented her from sitting for long periods and fatigue and malaise has interfered with concentration. She has also been seeing a pain management specialist for the past four years and receives nerve blocks in the spine. Due to the plethora of symptoms and distress, it has been impossible for this patient to perform her duties at work and [she] has, therefore, been put on disability.

The medical records from Cedars-Sinai Medical Center (under the alias "Brooklyn Kennedy") will show various surgical procedures and laboratory test results beginning as early as September 28, 2011.  On this date, Ms. Stout visited with Paul B. Hackmeyer, M.D., who noted that she had a long-standing history of pelvic pain, endometriosis and pelvic adhesions. Two days later, on September 30, 2011, Ms. Stout underwent an exploratory laparotomy with Dr. Hackmeyer due to her multiple surgeries for endometriosis, including left salpingo-oophorectomy, multiple laparoscopic procedures and laparotomy procedures, multiple courses of hormonal management and continuing pelvic pain.  Dr. Hackmeyer encountered extension adhesions and undertook lysis of adhesions and fulguration of endometriosis.

On December 22, 2015, Ms. Stout visited with Robert F. Katz, M.D., complaining of chronic pelvic pain that had been increasing over several months and that she reported as debilitating.  Dr. Katz noted a history of chronic pain, for which Ms. Stout was taking Percocet, and that she was allergic to anti-inflammatories and aspirin.  He described her medical history: two previous laparotomies; a ruptured hemorrhagic cyst; in September 2011, pelvic pain and extensive adhesions; in 2002, a left salpingo-oophorectomy for extensive adhesions; and four additional laparoscopies for chronic pelvic pain.  Dr. Katz remarked that she was in severe pain and desperate

for a surgery.  Ms. Stout underwent an abdominal supracervical hysterectomy with extensive lysis of adhesions (pelvic and omental) as well as a right ovarian cystectomy.

On May 18, 2016, Ms. Stout visited with Viliam Furdik, M.D., with complaints of severe pain in her abdomen, lower back and pelvis.  Dr. Furdik indicated that she had continued deep, lower-right and suprapubic pelvic pain that was constant, aching, gnawing and twisting.  He added that the pain radiated towards the right lower back and occasionally to the left side when severe, which was worse when she lay on her right side.  He noted that when she was feeling her worst, she could barely get out of bed and walk.  He added that Ms. Stout was taking one to one-and-one-half Percocet tablets per day in the morning and afternoon.  Dr. Furdik scheduled her for a superior hypogastric plexus block and refilled her prescription for Percocet.  Thereafter, Ms. Stout underwent a nerve block with Dr. Furdik on June 2, 2016.

Ms. Stout returned to Dr. Katz on March 21, 2017, complaining of debilitating, chronic pelvic pain despite her multiple surgeries.  Dr. Katz noted that he had been treating Ms. Stout since her prior surgery and that Ms. Stout had complained of debilitating right-side pain with a loss of the ability to work and excruciating pain requiring pain medication.  He noted that she had seen a pain management specialist, Dr. Furdik.  Dr. Katz indicated that he had given her Lupron to ease her pain.  Ms. Stout was insistent on removing her right ovary in the hope of easing her pain.  She thus underwent an operative laparoscopy, with extensive lysis of adhesions and right salpingo-oophorectomy.

On April 22, 2019, Ms. Stout visited David M. Ashkenaze, M.D., a board certified orthopaedic surgeon at Advance Ortho Specialists.  Dr. Ashkenaze noted that Ms. Stout continued to have quite a bit of pain in the knee and that she was unable to travel for eight weeks.  He noted she had had over 10 ovarian surgeries and a hysterectomy, and that her medications included thyroid, estradiol, Xanax, antacid and Percocet up to three times per day.  He added that she is allergic to all aspirin products and anti-inflammatories, which create an anaphylactic reaction.  In addition, the medical records from Dr. Ashkenaze confirm that she cannot travel:

The complete Newport Orthopedic Institute medical records show David S. Gazzaniga, M.D. and Taylor R. Dunphy (not in the administrative record, as well as Andrew P. Gerken, M.D. as the primary orthopedic doctors for Ms. Stout's knee, ankle and lumbar spine issues.  Dr. Bouvier's certification letter indicated that Ms. Stout's three fractured discs (L3, L4 and L5) were a result of spousal abuse.

Dr. Gazzaniga specifically noted on August 26, 2019 that Ms. Stout's left kneecap goes out

of place and then she falls.  While he had not seen documented imaging of her kneecap being dislocated, her patella is proximal and abnormal patella alta.  He noted that she reported multiple injuries from her knee giving away and her landing on her knee.  On physical examination, even lightly touching her skin causes Ms. Stout to yell out in pain, and he noted flexion to only about 90 degrees.  Dr. Gazzaniga diagnosed Ms. Stout with chronic regional pain syndrome and prepatellar bursitis in her left knee.

The evidence will show that in support of her claim, Ms. Stout submitted a mountain of evidence, including medical records from Kenneth A. James, M.D. relate to Ms. Stout's migraines, surgical bilateral salpingectomy and hysterectomy.  Also included are the medical records from Mission Hospital, as well as those from Andres Betts, M.D. (pain management), Dr. Katz (OB/GYN), Joseph H. Sugerman, M.D. and Edward A. Kantor, M.D. (for her mold exposure).

In summary, Ms. Stout submitted substantial evidence that she was disabled from severe illnesses that were initially thought to have resulted from exposure to toxic mold, including a thyroid condition known as "Hashimoto's disease" that has now been diagnosed as Multiple Sclerosis, and then later multiple bouts of pneumonia and an ER visit for her knee, ankle and three fractured discs.

The evidence will show that Ms. Stout's disabilities are severely debilitating; on some days she is unable to even get out of bed.  The above summary shows that, because of all of these conditions, Ms. Stout cannot work regularly at her "own occupation" or even at any other job.  As a matter of law, Ms. Stout is *per se* disabled from performing even a sedentary occupation because "sedentary jobs" require mostly sitting, generally for at least six hours per day.  Ms. Stout's doctors fully support her disability claims and they disagree with the report of Liberty's "paper reviewer," Taj M. Jiva, M.D.

**B.   Relevant Plan Terms**

As part of her employer's benefits Plan, Ms. Stout was entitled to STD benefits at 100% of her salary for the first six weeks and 66.67% for the remaining six weeks.  Although she was denied benefits during her "own occupation" period, as set forth above, Ms. Stout's disabilities qualify under an "any occupation" analysis as well.  Her pre-disability base pay was $120,000 per year and her annual compensation totaled $285,000 with commissions.  As noted above, Ms. Stout is entitled to both STD and LTD benefits under the Plan because of her disability.

With respect to STD benefits, the Policy defines "Disability" as "[T]he Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own

Job." "Material and Substantial Duties" are defined as "responsibilities that are normally required to perform the Covered Person's Own Job and cannot reasonably be eliminated or modified." "Own Job" is defined as "[T]he Covered Person's job that he was performing when his Disability or Partial Disability began."

With respect to LTD benefits, the Policy defines "Disability" or "Disabled" as:

1. For persons other than pilots, co-pilots, and crewmembers of an aircraft[2]:

   During the Elimination Period and until the Covered Person reaches the end of the Maximum Benefit Period, as a result of an Injury or Sickness, he is unable to perform the Material and Substantial Duties of his Own Occupation.

The Policy defines "Material and Substantial Duties" as "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." The Policy defines "Own Occupation" as the "Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy." Accordingly, the "own occupation" disability standard applies to both the STD and LTD claims.

### C. Ms. Stout's Documented Medical Conditions Render Her Eligible for LTD Benefits

Ms. Stout has MS. Without more information or investigation suggesting otherwise, disability is the assumption – and for good reason.

The First Circuit Court of Appeals has commented on the well-known facts regarding MS, including its severe nature, a good but incomplete list of the symptoms and a comment on the "progressive course" of the disease:

   Multiple sclerosis ("MS") is a grave disorder of the nervous system. The cause of MS remains shrouded in mystery and a cure still lies beyond the grasp of medical science. Symptoms of MS include weakness, fatigue, incoordination, and difficulty walking. Another common symptom of multiple sclerosis is spastic paraparesis

---

[2] Conversely, for employees working as pilots, co-pilots and crewmembers of an aircraft, their definition of disability is the more stringent "any occupation" definition.

which is stiffness, weakness, or spasticity in the lower extremities. Finally, depression is very common in multiple sclerosis patients. **MS "follows a slow, progressive course** marked by a history of exacerbations and remissions."

*Hughes v. Boston Mut. Life Ins. Co.*, 26 F.3d 264, 266 (1st Cir. 1994) (citations omitted) (emphasis added).

The swiftness of a person's decline and the severity of the effects of MS are directly related to the amount of stress to which a person is subjected:

MS is a degenerative nerve disorder which can produce symptoms ranging from fatigue and numbness to paralysis and death. **The severity of the symptoms is related in part to the amount of stress experienced in a patient.**

*D'Aprile v. Fleet Servs. Corp.*, 92 F.3d 1, 2 (5th Cir. 1996) (emphasis added); *see also Higgins v. Metro-North R.R.*, 318 F.3d 422 (2nd Cir. 2003).

MS affects a person's ability to "think, focus and remember," which is also exacerbated by stress:

Gagliardo's symptoms [of MS] varied over time and included muscle spasms, fatigue and numbness in her hands, back, and legs. **The most severe of these symptoms was Gagliardo's fatigue. The fatigue affected her ability to think, focus and remember. All of Gagliardo's symptoms were subject to being exacerbated by stress.**

*Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 567 (3rd Cir. 2002) (emphasis added).

Under the Social Security Act, federal law recognizes three separate impairments caused by MS, including these two: disorganization of motor function, visual or mental impairment; and significant fatigue demonstrated on physical examination. 20 C.F.R. pt. 404, subpart P, app. 1, sec. 11.09A-C.

Ms. Stout's story is very similar. In 2019, she was diagnosed with Hashimoto's disease, and in March 2021, she was diagnosed with Multiple Sclerosis. The MS diagnosis explains the nature and extent of her continuing disability, the disability that Liberty's paper reviewers incredibly refused to acknowledge. Liberty's reliance on the opinions of its biased paper reviewers despite the opinions of Ms. Stout's treating physicians was clearly in error. The Court will easily find that Ms. Stout is disabled whether it applies the correct de novo standard or the abuse of discretion standard. The new diagnosis of MS explains the disability that Liberty refused to acknowledge, and it underscores the extent of Liberty's bad faith in denying her claim.

**5.  THE EVIDENCE WILL SHOW THAT MS. STOUT WAS AND IS DISABLED, AND THAT LIBERTY'S DENIAL OF THE CLAIM WAS INCORRECT**

      **A.  The Administrative Record Unequivocally Establishes Ms. Stout's Continuous Disability From February 2019 Through the Present**

The records in the AR support Ms. Stout's position that she has been disabled and unable to perform her duties as a global brand customer executive both at DS Americas and as the occupation is performed in the national economy.  Indeed, her employer agreed to assist her in filing a disability claim, because she was unable to even apply for them online by herself. Unfortunately, that same employer's claim administrator wrongfully terminated her two weeks later.  While Liberty alleges that Ms. Stout's physical condition shows "no functional impairment" with respect to performing a reasonable occupation with reduced job requirements, that is simply incorrect, as summarized above.

Regarding the major areas of her disability (the February 2019 claim was originally documented on February 26, 2019 as "chronic medical disability"), Ms. Stout suffers from the following:

1) Multiple Sclerosis, which was previously diagnosed only as a major thyroid condition (from mold exposure starting in June 2018) known as "Hashimoto's disease" or Hashimoto's thyroiditis, an autoimmune disease that damages the thyroid gland.  It is the most common cause of hypothyroidism (underactive thyroid).

2) Severe pain - her current pain-management specialist is still treating her for the three fractured discs and nerve blocks (she had spinal surgery in 2015 for domestic-dispute injuries).

3) Instability as evidenced by her fall down 16 stairs in March 2019 from which she is still experiencing pain in her knee and ankle.

4) Severe abdominal ovarian disease and has had 11 abdominal or intestinal operations.  She has a rare disease in which scar tissue attaching to her organs.  Her intestines kept rolling out of her abdomen, which was documented by her OB/GYN specialist.

5) Moderate episodes of major depressive disorder, unspecified whether recurrent" and PTSD, for which she has taken anxiety medication daily (Xanax) since domestic abuse started in 2013.

**B.** **Liberty Improperly Relied on Biased, Incomplete and Inadequate Paper Reviews**

Liberty's initial denial of Ms. Stout's claim for disability relied heavily on the opinion of Dr. Jiva. Dr. Jiva did not review orthopedic consultation notes or discuss her case with any of Ms. Stout's orthopedists. Specifically, Ms. Stout had debilitating pain and had not fully recovered from pneumonia, and this information was provided to Liberty in her appeal of the denial of her benefits. Dr. Jiva did not review or base his opinion on her clearly well-documented ovarian disease history, chronic and debilitating pain and extensive surgical history.

Numerous courts have ruled that requiring the claimant to meet a standard of evidence not set forth in the applicable plan is improper, and mandates that the claim decision be overturned. In *Saffle v. Sierra Pacific Power Company*, 85 F.3d 455, 459-60 (9th Cir. 1996), the Ninth Circuit ruled that requiring a claimant to meet a standard that is not present in a policy's documents "effectively imposes a new requirement for coverage," but because "an administrator lacks discretion to rewrite the Plan," to do so is an abuse of discretion.

Ms. Stout has provided objective evidence of her back condition, which revealed lumbar spondylosis with mild spinal-canal stenosis at L3-L4 and L4-L5, L4-L5 broad-based central disc protrusion 3.5 mm and patent bilateral neural foramen and L3-L4 annular fissure. Her chiropractor Dr. Arthur has diagnosed her with intervertebral disc displacement and radiculopathy, and she has consistently presented to her treating providers with acute pain in her hip, back and legs.

The opinions of Drs. Furdik and Bouvier carry far more weight than those of Liberty's paper reviewer. In *Williams v. United Omaha*, 2013 WL 5519525, at *12 (N. D. Ala. Sept. 30, 2013), the court explained that the opinions of a treating physician are usually more credible because "direct contact with the patient over a period of time would provide a more thorough opportunity to assess her credibility regarding level of pain and the true pattern of her abilities." *Id.* at *12. The Ninth Circuit has criticized overreliance on paper reviews like these. *See Montour v. Hartford Life & Accident*, 588 F.3d 623, 630 (9th Cir. 2009); *see also Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program*, 718 F.Supp.2d 1151, 1164 (N.D. Cal. 2010) ("The Court likewise gives little weight to the opinions of [peer reviewers] Drs. Marion and Fuchs. Although they reviewed plaintiff's medical records, they did not examine her in person.").

Despite her recommendation that she be provided with medical records and evaluations dated after April 2018, the record shows that Dr. Chyun never reviewed any of those records. The March 19, 2020 addendum to her opinion stated:

1    Essentially, Liberty withheld the available documentation of Ms. Stout's medical treatment

2    after April 2018 from Dr. Chyun. Dr. Chyun's response was only to acknowledge that she had not

3    been provided with the medical records needed to assess Ms. Stout's disability from pain, fatigue,

4    and mold exposure, and to state that her opinion had not changed. Dr. Chyun maintained her

5    position despite the fact that she believed that **chronic pain was the primary disabling diagnosis**

6    and despite her conversation with Dr. Bouvier in which Dr. Bouvier told her that Ms. Stout was

7    disabled based on chronic pain, low pain tolerance, and PTSD.

### C. Liberty Did Not Consider Ms. Stout's Occupational Duties And That She Was Per Se Disabled Under *Armani*

9    The evidence will show that Liberty's claim denial also failed to consider the substantial

10   and material duties of Ms. Stout's own occupation. First, under the Plan's terms, Ms. Stout is

11   considered disabled if she cannot perform the substantial and material acts necessary to fulfill her

12   own occupation. The proper characterization of Ms. Stout's occupation must focus on all core,

13   essential aspects of her job, which included mentally and physically demanding work, travel,

14   communication and long hours in a fast-paced environment. The opinions of Liberty's paper

15   reviewers filed to consider the demanding nature of her own occupation, particularly the physical

16   requirements attendant to frequent travel. Liberty completely ignored substantial evidence of her

17   inability to lift heavy suitcases, refusing to acknowledge that she was incapable of performing her

18   job because of her disabling conditions.

19   Liberty was required to consider the substantial and material duties of Ms. Stout's regular

20   occupation in evaluating her appeal. It completely failed to do so. Under the Plan's terms, Ms.

21   Stout is considered disabled if she cannot perform the material and substantial duties of her own

22   job.

23   Courts have consistently found that an insurer's disability-benefits denial is "unreasoned"

24   when the insurer fails to consider the claimant's job duties in assessing whether the insured is

25   disabled under an "own occupation" plan.[3] As in the circumstance presented here, where

---

[3] *See McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 381 (1st Cir. 2015) ("Let us be perfectly clear: under an own occupation standard, medical evidence is only part of the equation.") (citing *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 855 (3d. Cir. 2011)); *Doe v. Unum Life Ins. Co. of Am.*, 35 F.Supp.3d 182, 190 (2014) ("It also failed to tailor its analysis of Doe's capabilities to his high-stress job setting."); *Kuntz v. Aetna Inc.*, 2013 WL 2147945, at *11 (E.D. Pa. May 17, 2013) ("Therefore, because no modification was available, Kuntz needed to be able to execute the duties 'normally required for the performance of [her] occupation' in its normal setting—the office—or else she would meet the definition of 'disabled' under the Plan."); *Loomis v. Life Ins. Co. of N. Am.*, 2011 U.S. Dist., No. CIV.A. 09-3616, 2011 WL 2473727, at *6 (E.D. Pa. June 21, 2011) ("His

1    a plaintiff has a specialty occupation not set forth in the *Dictionary of Occupational Titles*,

2    an administrator cannot arbitrarily sidestep the requisite analysis by substituting a generic

3    occupation for it.[4]  As in the circumstance presented here, where a plaintiff has a specialty

4    occupation not set forth in the *Dictionary of Occupational Titles*, an administrator cannot

5    arbitrarily sidestep the requisite analysis by substituting a generic occupation for it.[5]

### D. Liberty Failed to Consider the Comorbid Nature of Ms. Stout's Condition And the Side-Effects of Her Medications

7           Dr. McPhee's opinion was also improper because he consistently failed to consider

8    Ms. Stout's conditions and treatments holistically.  On its review, Liberty also failed to consider the

9    comorbid nature of her disabling conditions as well as how the side effects of her medication affect

10   her ability to perform her own occupation.  It was improper for an insurer to not consider the

11   interaction of all conditions.[6]  Dr. McPhee only considered restrictions and limitations due to Ms.

12   Stout's knee condition; this completely ignored and mischaracterized the complexity of her overall

13   condition.  Ms. Stout has a well-documented range of maladies, including multiple sclerosis, toxic

14   mold exposure, Hashimoto's disease, fractured discs in her spine, intestinal adhesions, endometriosis

15   and PTSD.

16          Liberty also failed to consider the side effects of Ms. Stout's necessary medications.  She

17   has been prescribed Percocet to manage her severe pain as well as Xanax for anxiety.  *See Hertan*

18   *v. Unum Life Ins. Co. of Am.*, 2015 WL 3632244 (C.D. Cal. June 9, 2015).  Ms. Stout was

     prescribed strong pain medications from the onset of her conditions, and those medications have

---

19   medical review letter, however, simply recites various statements and letters issued by Plaintiff's

20   physicians and concludes that Plaintiff has the capacity to work and is not incapable of working. [Peer Reviewer] Dr. Unsell's analysis never refers to the regular occupation standard or otherwise

21   suggests that the correct standard was applied.") (Internal quotations omitted).

     [4] *See McDonough*, 783 F.3d at 380 ("Thus, a reasoned determination of the existence of disability

22   requires, *inter alia*, a review of the material duties of the claimant's *particular* position and an assessment of how those duties align with the position as it is normally performed in the national

23   economy.") (emphasis added) (citing *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 618-19 (6th Cir. 2006)).

24   [5] *See McDonough*, 783 F.3d at 380 ("Thus, a reasoned determination of the existence

25   of disability requires, *inter alia*, a review of the material duties of the claimant's *particular* position and an assessment of how those duties align with the position as it

26   is normally performed in the national economy.") (emphasis added) (citing *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 618-19 (6th Cir. 2006)).

     [6] *See, e.g.*, *Kirkpatrick v. Liberty Mut. Group, Inc.*, 856 F.Supp.2d 977, 998–999, 1000 (S.D. Ind.

27   2012) (granting summary judgment because the administrator failed to address the claimant's "physical condition as a whole," and instead focused on each diagnosis individually); *Maiden v.*

28   *Aetna Life Insurance Company*, 2016 WL 81489, at *7 (N.D. Ind. Jan. 6, 2016).

1  substantial negative side effects that contribute to her current disabilities and mental state, to the

2  point of her always feeling loopy, being unable to concentrate, extremely sleepy, fatigued,

3  imbalanced, incoherent and unable to get out of bed at times.

4      Whereas these medications are necessary to treat Ms. Stout's underlying conditions, a side

5  effect of her treatment is an exacerbation of some of her already-present and severe symptoms.[7]

6  Dr. McPhee completely ignored the interplay of her medications' side effects and the comorbid

7  nature of her disability.  Lincoln improperly failed to consider the side effects of her necessary medication and wrongfully denied her claim.

8      Liberty should have considered the cumulative effects of Ms. Stout's medications and

9  conditions.  As the court explained in *Maiden v. Aetna Life Ins. Co.*, 2016 WL 81489, at *7 (N.D.

10  Ind., Jan. 6, 2016), it was improper for the plan administrator to consider the plaintiff's physical

11  and psychological "comorbidities in isolation."  The court found that the physical and

12  psychological conditions and effects should have been considered cumulatively.  *See Kirkpatrick v. Liberty Mut. Group, Inc.*, 856 F.Supp.2d 977, 998–99, 1000 (S.D. Ind. 2012) (granting summary

13  judgment because administrator failed address the claimant's "physical condition as a whole," and

14  instead focused on each diagnosis individually).

### C.  The Personal Statement of Ms. Stout Provides Additional Support for Her Continued Diagnosis of Disability

17      In addition to its duty to review the abundant medical evidence submitted, Liberty had a

18  duty to review Ms. Stout's own personal statement in support of her disability, consistent with the

19  Ninth Circuit's recent decision in *Kibel v. Prudential Life Ins. Co.*, No. 16-56169, 2018 WL

20  832870, at *1 (9th Cir. 2018).  In *Kibel*, the Ninth Circuit reversed the district court's decision that

21  upheld Prudential's disability benefits denial because "the district court and Prudential clearly erred

22  in failing to consider the personal statement that Kibel submitted explaining that her fatigue did, in

23  fact, render her totally disabled." *Id.* at *2.  The *Kibel* court relied on *Demer v. IBM Corp. LTD*

24  *Plan*, 835 F.3d 893, 904-07 (9th Cir. 2016) for the rule that a district court and a disability insurer

must "consider a claimant's subjective account of pain" when deciding whether she is disabled. *Id.*

---

26  [7] That Ms. Stout's physicians have prescribed, and she has been approved to receive, powerful medications are also objective evidence that Ms. Stout is disabled.  *See Flanigan v. Liberty Life*

27  *Assur. Co. of Bos.*, 277 F.Supp.2d 840, 844 (S.D. Ohio 2003) ("The fact that Plaintiff is on many strong medications is objective evidence that she is indeed chronically disabled."); *Wasson v. Media*

28  *Gen., Inc.*, 446 F.Supp.2d 579, 586 (E.D. Va. 2006) (same).

at *2.[8]  Based on the claimant's personal statement describing her fatigue as "an overpowering feeling of extreme tiredness, exhaustion" and weakness that left her "completely drained physically and mentally," which Prudential had ignored, and other medical evidence in the insurer's administrative record (*Id.* at *1), the Ninth Circuit found that the claimant had met her burden of proving, under a de novo standard of review, that she was disabled from working by her multiple sclerosis symptoms. *Id.* at *2.  It reasoned that the claimant's personal statement, "appropriately considered, further supports finding that Kibel's MS prevented her from doing her job." *Id.*

Many other courts agree with the principles espoused by the Ninth Circuit in *Demer* and its progeny *Kibel*.  For example, in *Godmar v. Hewlett-Packard Co.*, 631 F.App'x 397 (6th Cir. 2015), the Sixth Circuit found that the administrator had acted in an arbitrary and capricious manner, in part, by failing to properly consider the claimant's personal statements regarding the side effects of his medication and his pain level. *Id.* at 405-07.[9]  Courts have relied on *Demer* to find that a claimant's subjective reports of his or her pain are significant, not only in deciding disability, but also in placing weight on such subjective reports as corroborated by the claimant's colleagues and friends, such as in *Laurie v. United of Omaha Life Ins. Co.*, 2017 WL 975947, at *17 (D. Or., Jan. 23, 2017), *report and recommendation adopted,* 2017 WL 970262 (D. Or. Mar. 13, 2017):

> Ms. Stout's own description of her symptoms is telling and must be accorded due weight. As Ms. Stout describes it:

> "My doctor put me out on disability effective February 15, 2019.  My doctor stated I could no longer physically work, and I needed to focus on my health[.] I continued to further suffer from health issues.  She was concerned about [my] working while being on serious medication that was impacting my mental ability."

---

[8] The *Demer* court referred to the claimant's personal statement in finding that the insurer had abused its discretion by not finding him disabled:

> Moreover, in a personal statement, Mr. Demer claimed that he did, in fact, suffer side effects as a result of his medications, including fatigue and difficulty with concentration (*e.g.*, the medications "cause me to fatigue and, and they help confuse me in my thinking and ability to communicate"; "I can no longer read complex materials because I cannot concentrate to comprehend them"; and "I also have memory lapses after having read the pages I may still be looking at").

> *Id.* at 905.

[9] The claimant in that case stated the following: "Currently, I am not able to function in my normal personal activities or work activities due to the 24 hours a day morphine consumption and use of Percocet. On my current meds I am restricted from driving, and I am sleeping up to 20 hours per day several times a week." *Id.* at 405.

- June 2018, I became seriously ill due to Black Toxic Mold that was found in my house in Los Angeles. I was in the hospital several times and the mold left me with serious health issues. I had notified my employer the day I was admitted into the hospital and had to take numerous days off work since being infected with the mold in my body.

- I had to move out of my house 3 times due to the mold issue and being so sick. My house was no longer livable, and I moved over 2 plus hours from my home in Los Angeles, CA 90077.

- My health continued to deteriorate to the point, and I was seen by several professional doctors in Los Angeles. When I traveled to Boston in November 2018 for a business trip, I became seriously ill and suffered from pneumonia when I returned.

- After moving to my new home 2 plus hours from Los Angeles, I had to RE-ESTABLISH all new doctors and started being seen by Caduceus Medical Group due to being so ill from being infected by the mold.

- When I was living in Los Angeles, I was seen numerous times in the ER, Pain Management Specialist, Ear, Nose, and Throat Specialist, Eye Specialist

- Again, when I had to move out of my house, I had to re-establish all new doctors as I was too sick to travel to Los Angeles.

- Additionally, I have documented all of my health issues with my employer Dassualt Systemes. I also completed a disability document for medical accommodations prior to starting my employment and had my pain management specialist write and confirm my disability disc issues to Dassault Systemes. All of my health issues have been reported to my employer since I became so sick due to the mold infection.

- I am suffering from 3 fractured discs due to domestic violence, which flared up to the point I could not get out of bed due to the pain. Again, I had been treated by a pain management specialist in Los Angeles, who had performed numerous nerve blocks in my spine to help with the pain. The mold illness impacted my nervous system and flared up my spine, the pain was unbearable to the point I could not walk, sit in a chair, and work from home, travel any longer. This is another reason why my doctor put me out on

disability. When I moved in November, I had to find a new pain management specialist to treat me. I have been on strong pain medication for several years due to the pain in my spine and being infected by the mold that has left me ridden. I have been seeing the pain management specialist to manage the pain in my spine since 2015 and he had put me on heavy pain medication. I have an allergy to aspirin, anti-inflammatory meds, and my doctor put me on Percocet 7.5-325 every 4/6 hours since 2015, and I was having to take the pain medication while working, traveling. I had also been seeing a Therapist in Beverly Hills for 5 years to help with the trauma. When I moved, I needed to find a new therapist to help me for the PTSD due to the domestic violence, but I became so sick with my health issues I could not even work to explore new doctors. My disc/nerves were in so much pain, I was crying. I could not sit in a chair and had to work lying flat in my bed often, needed help to even stand up the pain was so bad. My spine surgeon wanted me to have additional nerve blocks to try to help with the pain.

○    NOTE – WHEN I WAS HIRED WITH DASSUALT SYSTEMES, I COMPLETED NOTIFICATION OF DISABILITY DOCUMENTATION AND MY SPINE DOCTOR ALSO PROVIDED UNDER A COURT DECLARATION, TO DASSUALT SYSTEMES, MY CONDITIONS WITH MY SPINE, FRACTURES AT L3,L4,L5 AND REQUIRED UNDER AMERICANS WITH DISABILITY REQUIREMENTS. In October 2019, my medical insurance (United Healthcare) finally approved nerve blocks and confirmed that L5 SI is protruding into my spinal cord. This is a major reason I cannot sit.

•    I am also suffering from severe abdominal ovarian disease and have had 11 abdominal, intestinal, operations to treat my disease. I have a rare disease with scar tissue attaching to my organs and ovarian remnant disease. I was treated in Los Angeles by my OBGYN specialist and over the last several years, I continued to have issues with my intestine after my last surgery in 2017 and my intestine kept rolling out of my abdomen which was documented by my OBGYN specialist, the new OBGYN specialist I found when I moved, new doctors in Laguna Beach. My intestine had gotten so bad the doctor wanted to rule out a

hernia and had me see a hernia specialist who ordered a CT scan. My appendicitis was not found on the CT scan and the doctor said he believed that my intestines could be blocked again due to the scar tissue and attached to my organs after my last operation in 2017. My doctor ordered me to see a General Surgeon so he could order an MRI to try to determine how to treat me and if I need to have abdominal surgery. My intestine has rolled out of my abdomen numerous times and the pain has been horrible to the point I am screaming and having to push my intestines back into my abdominal wall. This happened when I was admitted into the ER due to my fall and leg injury, which was documented as the doctor, RN had to help me walk and push the intestines back into my wall until the pain resolved. I had scheduled to see the General Surgeon twice and had to cancel both appointments due to falling down 16 stairs at my house after my doctor put me on disability and injury to my leg/knee. My intestines have bulged out of my abdominal wall in front of the ER doctor, RN, my mother, my driver who took me to my doctor's appointments due to not being able to drive. They bulge out several times a day and the pain is unbearable to sit in a chair and work. Again, I suffer from a rare ovarian disease, had 11 abdominal operations as my organs get attached due to adhesions and my doctors believed that my intestine may be blocked, restricted to my abdominal wall, appendicitis. I have been hospitalized several times in Los Angeles for this issue, bedridden for a year from Dec. 2015 to April 2017. The doctors had me have a CT SCAN to rule out a hernia and now have ordered an MRI to see if there is further scar tissue attached to my intestines, bladder and other organs. In 2016 after my last abdominal surgery that lasted over 7 hours, I was so disabled I was bedridden for over 16 months until the doctors could go back for a further surgery to remove my ovary which had been embedded in my spine, abdominal wall, intestines, bladder, organ's. I also have scar tissue on my bladder and these issues are permanent disabilities.

- My new doctor at Caduceus Medical Group also did numerous tests, lab work and determined the mold infection had caused a major Thyroid Disease "Hashimotos" which left me bedridden. I could no longer function. I have no physical energy and was sleeping over 15 hours a day, I could not get out of bed,

Case No. 20-CV-01675 FLA (KESx)

PLAINTIFF'S OPENING BRIEF

care for myself, and was also diagnosed with a blood disorder which the doctors are still trying to help treat me.  The disease attacked my immune system, muscles, and joints.  The fractured discs in my spine were in unbearable pain.  I could not eat, get out of bed, and therefore lost weight.  My pain management specialist wanted me to have two additional nerve block surgeries to block the pain in my spine, but I had to move from my home for the 3rd time in November due to the mold and had to find a new pain management specialist.  Once I found my new pain specialist[,] he again treated me with the strong Percocet pain medication, instructed me to see a general surgeon for my abdominal pain and was ordering my medical records from my pain management specialist in Los Angeles so he could treat my fractured discs, try to relieve the pain in my spine nerves.

- I reported to my doctor, that my brain was not functioning, I could not focus, could not even read or understand what people were saying to me, my body and immune system was so weak.  My doctor put me on several thyroid medications and also gave me B12 injections to take at home to try to help with my lack of energy, put me on anxiety medication and others.

- The mold had also caused severe anxiety and my doctor in Los Angeles had put me on anxiety medication.  I had to take 4 or 5 Xanax's per day as the anxiety due to the thyroid issue had caused me to tremble, have horrible panic attacks, and felt like I couldn't breathe.

- I could not function being put on such strong medications, pain in my spine, could not sit, eat, lost 20 pounds, the medication was impairing my ability to work, travel, function and my doctor had reported this. I had also been taking Xanax due to the PTSD since 2013 and the medication had to be increased due to the mold and thyroid issues.  My doctor had put me on so many medications I could not function. I could not understand conference calls, was not able to perform my job at all I was so sick and further became bedridden.  It was to the point I was only working about 1 to 2 hours a day and I was sleeping more than 18 hours a day.  My body was and is broken from all my health issues.  My doctor told me she wanted me on disability to focus on my health period and she put me on disability.  I couldn't make phone

Case No. 20-CV-01675 FLA (KESx)
PLAINTIFF'S OPENING BRIEF

calls, I couldn't work on my computer, I could not focus on anything including in my personal life I was so sick my mother had to come stay with me and help me.

• My Ear, Nose and Throat Specialist in Los Angeles had also treated me with strong steroids, injections in my sinuses numerous times due to the mold issues and still having to be treated.

• Treated by eye specialist due to mold issues causing inflammation in eyes numerous times and still having to be treated.

• Again, as I stated, I had to move from my home in Los Angeles, CA 90077 and I moved over 2 hours away to Dana Point, 92629. When I moved, I had to re-establish all my doctors. It also took me weeks being a new patient to get in[ ]to see new physicians. I had appointments scheduled at the end of March 2019 and April to help treat my digestive issues caused by the Thyroid issues and also had two appointments with a top General Surgeon to see how to treat my abdominal disease, both appointments were canceled because I became so weak, dizzy from the Thyroid disease, all medications, mold infections, pain in my discs, I fell down 16 stairs at my new home. I was taken to the ER and treated by several doctors to drain, repair my knee as I was in so much pain from the fall, I couldn't walk on my leg, was in a brace and have been in a knee brace since the fall. I hurt my ribs, concussion and my entire body was bruised. My mother had to physical carry me and has been taking care for me as I can't care for myself. My knee so bad it keeps going out and in June my knee dislocated again, and I fell again, I tore my right ankle, leg and have not been able to walk on either. This is why my doctor wanted me on disability I was too sick to work. The black toxic mold caused numerous health issues, it was embedded in my body, I couldn't even touch my skin, it caused an autoimmune disease, Hashimoto's disease, further flared up the discs in my spine to the point I could not sit, could not get up from a chair and had to be in bed, the Hashimoto's disease caused so many health problems, even impacted my blood, became anemic to the point I now have to take injections at home to help me. I had become extremely impaired with my physical health and could not work.

• I have attached my doctor's detailed medical report, medical records, medication, and the reason why she felt I could no longer work and put me out

20

on medical disability on February 15, 2019. Additionally, I reported to my employer that my doctor put me out on disability and was informed that the Dassault Systemes disability group would help me open my claim as I was too sick to even be online.

- I've also attached all of my doctor's information both in Los Angeles and in Dana Point area for your reference. Please help to review my medical information I have provided and please approve my disability claim. Again, my doctor put me out on disability as I could no longer function period. I could not work with the Thyroid, Spine, Abdominal conditions and also being on such strong pain anxiety medication, panic attacks. I could not function, and the Thyroid disease was so bad I had no energy to get out of bed was sleeping over 15 hours per day for several months. I could not see the new General Surgeon, or other doctors to treat my spine, gastro issues as I could not walk after my fall, my knee was so damaged, I had to miss the appointments and reschedule them.

Liberty's continued denial of Ms. Stout's claim without appropriately considering her Personal Statement makes it ripe to be overturned by the court in this ERISA lawsuit. Ms. Stout's own description of her symptoms is telling and must be accorded due weight.

## 6. CALCULATION OF DAMAGES

**TOTAL VALUE OF BENEFITS (*without* estimated SSDI offset): $1,169,737:**

- **$14,443** for past-due STD benefits that are owed to Ms. Stout from February 16, 2019 to May 18, 2019. This amount includes offsets for Ms. Stout's receipt of EDD benefits during the relevant 13-week period.
- **$3,124** for the pre-judgment interest that has accrued on the past-due STD benefits.
- **$1,152,170** for the net present value of LTD disability benefits calculated through the end of the Policy's maximum benefit period. Ms. Stout will be entitled to a total of 204 payments under the Plan at $6,667 per payment. Assuming a discount rate of 2%, Liberty owes Ms. Stout $1,152,170 in LTD benefits.

**TOTAL VALUE OF BENEFITS (*with* estimated $3,000 SSDI offset): $651,287:**

- **$14,443** for past-due STD benefits that are owed to Ms. Stout from February 16, 2019 to May 18, 2019.
- **$3,124** for the pre-judgment interest that has accrued on the past-due STD benefits.

- **$633,720** for the net present value of LTD benefits calculated through the end of the Policy's maximum benefit period.  Ms. Stout will be entitled to 204 payments under the Plan at $3,667 per payment ($6,667 gross benefit minus $3,000 for estimated SSDI = $3,667).  Assuming a discount rate of 2%, Liberty owes Ms. Stout $633,720 in future benefits.

**ATTORNEYS' FEES**

- **$130,000** for the litigation attorneys' fees and costs that Ms. Stout has incurred thus far in this action, pursuant to 29 U.S.C. Section 1132(g)(1).

TOTAL DAMAGES (with SSDI offset):  **$651,287 excluding attorneys' fees.**

TOTAL DAMAGES (without SSDI offset): **$1,169,737 excluding attorneys' fees**

Dated: October 15, 2021                                        THE ZACHER FIRM

Dieter Zacher

**PLAINTIFF'S OPENING BRIEF**                          Case No. 20-CV-01675 FLA (KESx)

**PROOF OF SERVICE**
*Julie Stout v. Liberty Life Assurance Company of Boston*
Case No. 20-CV-01675 FLA (KESx)

I am and was at all times herein mentioned over the age of 18 years and not a party to the action in which this service is made. At all times herein mentioned I have been employed in the County of Orange in the office of a member of the bar of this court at whose direction the service was made. My business address is 17011 Beach Boulevard, Suite 900, Huntington Beach, California, 92647.

On October 15, 2021, I served the following document(s):

**PLAINTIFF'S OPENING BRIEF**

by placing ☐ (the original) ☒ (a true copy thereof) in a sealed envelope addressed as follows:

Byrne J. Decker CA Bar No. 337052          Attorneys for Defendant
byrne.decker@ogletree.com                  Liberty Life Assurance Company of Boston
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
Two Monument Square, Suite 703
Portland, ME 04101
Telephone:     207-387-2957
Facsimile:     207-387-2986

☒     **BY CM/ECF:** With the Clerk of the United States District Court of California, using the CM/ECF System. The Court's CM/ECF System will send an e-mail notification of the foregoing filing to the parties and counsel of record who are registered with the Court's CM/ECF System.

☐     **(Federal):** I declare that I am employed in the office of a member of the State Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on October 15, 2021, at Huntington Beach, California.

Dated: October 15, 2021

Dieter Zacher